Case number 16-1382, Louisiana Public Service Commission Petitioner v. Federal Energy Regulatory Commission. Mr. Fontham for the petitioner, Ms. Caper for the respondent, Mr. Nath for the intervener. May it please the court, my name is Mike Fontham, I represent the Louisiana Commission. FERC's orders in this case represent a preconceived decision looking for a rationale to support it. FERC found that rationale in a brief submitted unilaterally by Energy to which FERC solicited no response. Speaking of no response, it seemed to me one of the most interesting passages of the order on remand was footnote 58 and the contents of that footnote which seemed to list quite an array of cases which might be said to lay out a default rule that in the case of cost allocation or rate design matters, the usual disposition would be to deny refunds unless there were some less equitable factors pointed the other way. I didn't see anything in your brief responding to that. Your Honor, those are the very same cases that Judge Rogers' opinion responded to. Well, there are quite a few more actually. Well, Your Honor, the opinion in 2014, speaking of Southern, said that one point does not make a line, which is quite true clearly, but there are a whole ream of cases not discussed in the 2014 opinion. No, Your Honor, this is a holding company case. In this case, a company overcharged another company. Energy Arkansas overcharged. Yeah, I have the facts. Okay, Your Honor, and those cases are not holding company cases. Those cases are cases in which you have a utility selling to wholesale requirements customers and allocating costs among those wholesale requirements customers. This is not a utility selling to customers. This is one utility selling to another utility. Why does that make the principle articulated in those cases inapplicable? It makes the principle inapplicable because consumers, in the case of the rate design or the cost allocation, are making decisions based on what the cost allocation or the rate design said. In this case, it's just payments among the holding company companies. There's no rate design involved in that at all. I'm sorry. So you're saying that the operating companies, that the rate design had no impact on the economic incentives of the operating companies? I'm saying it did not because the system decided the economic incentives, Your Honor. In this case, the complaint alleged that the system wanted these customers and, therefore, the operating companies were engaging in interruptible sales. But, Your Honor, please let me go back to what you had brought up before. There are a dozen, well, there are at least a dozen holding company cases in which FERC ordered refunds from one company to another, unjust and unreasonable cases, not tariff violations. There are three that were made while this case… We're always in the realm of unjust and unreasonable. The question is cost allocation or rate design. It was cost allocation in all of those cases because the energy bandwidth tariff is a cost allocation. The cost allocations in the system agreement originally under this same tariff in the Middle South cases in the 80s, FERC granted refunds. FERC has granted refunds without fail in these energy cases. They've done it for Central and Southwest. They've done it for AEP. The one exception was that Southern Company case, which Judge Rogers' opinion says they didn't really say much and they certainly did not set forth a policy. Your Honor, you have to consider if the utility goes in and files with a rate design and then two years later, FERC decides to change that rate design, consumers didn't know they might change the rate design because they weren't asking to do that. Here, we filed a complaint that asked to change the rate design or the cost allocation. Yeah, that would normally be true if you have a 206 proceeding, right? And we have a 206. Normally, that doesn't just spring out of the air. And even if it does, it's initiated by the commission, it would be noticed. Well, Your Honor, I think in this case, everybody knew that the rate design might change. In fact, this Court has held that and that refunds might be made because the Regulatory Fairness Act says that. Energy bitterly opposed the complaint. Energy is the one who had the power to change that tariff at any minute, any minute. I don't see a distinction between this and any ordinary 206 case. Well, Your Honor, the distinction here is one utility… One sort of notice initiates the proceeding, and after that, people buying and selling are on notice that a change might occur. Well, yes, Your Honor. Your Honor, I'm asking why doesn't the principal step forth in those cases discussed in Front Row 58? Well, I'm trying to answer that question. There's a big difference between a utility that allocates costs among the other sellers and a utility that is allocating costs among customer classes, retail, wholesale, a certain kind of wholesale customer versus another kind of wholesale customer. FERC never… You know, FERC automatically made refunds in the Middle South cases. It did so because, you know, it was one utility overcharging another, and it had a policy to grant refunds for overcharges. FERC has basically tried to restate its policy or undo its policy, but how do you explain that we filed a complaint, three complaints on cost allocation on the bandwidth tariff between 2005 forward to 2010? Those were filed rate cases, right? No, Your Honor, they weren't filed rate cases. We said the rate is unjust and unreasonable, change it. For instance, you can't distinguish this at all in material respects from the interruptible load bandwidth case. We filed in 2007. We said you shouldn't have interruptible load in this allocator, which allocated even more capacity costs than in this case. FERC denied the complaint. Five years later, FERC granted the complaint. FERC granted refunds, and they switched right through at the retail level. And there are two other complaint cases that we filed, one on the sale leaseback related to Riverbend, another based on the allocator that was used to allocate ADIP, accumulated deferred income taxes in the tariff. Those were both complaint cases, unjust and unreasonable cases. FERC eventually granted the complaint. FERC required them to change the tariff. FERC granted refunds. And during this entire period, FERC was granting refunds on any number of other things, tariff violations, accounting errors, unjust and unreasonable that turned out to settle, and refunds were granted. If there were a policy against refunds, I can assure you that the retail regulators who would be harmed by the refunds would not agree to the settlement. Well, let me ask you, given our decision that you referred to as my decision, we, this court, sent the case back to FERC.  This court was leaving open the possibility that you would not prevail on remand. Agreed. So the notion that FERC adopted energy free for its arguments, et cetera, to me doesn't go very far. It seems to me you have to focus on what FERC did, and I thought that's what your briefs were focusing on. In terms of the critical errors. So in your terms now, you have a laundry list, but what do you think are the most fundamental errors? Okay, Your Honor, first, this court said in LPSC 2 everybody was on notice. FERC, in its order, as the underpinning for really most of its decision, said we can't find that the public notice published in the Federal Register is good enough for retail rate payers. So that's where FERC says the notice was inadequate, and you argue it didn't explain why it reached that conclusion. Well, it didn't explain why, but as a matter of law, it's incorrect. FERC has a regulation that says if you file a complaint, it's published in the Federal Register, they have precedent that says pinhook, which we cited, that's constructive notice to everybody. Well, you would agree, wouldn't you, that the agency seems to have taken the position that it can start from scratch on this remand, and whatever we may have held, it's not bound by it. Well, it did start from scratch, but it did it for one side and not the other. Well, I know that's a different point I'm trying to get you to focus on, though. Well, would you like me to focus on the error point? On the error point that you were talking about. So you think one of the most critical errors is, A, you're saying failure to adhere to Louisiana 2 notice, and then even if that didn't exist, not explaining why the notice was inadequate, when this is the same kind of notice that's used every single week. So what's the second one? The second error, Your Honor, is to say this possibility, even though we agree, the Supremacy Clause applies, this possibility that the refunds might not flow through outweighs any consumer harm, which is known, happened, and could be remedied. That is an error in the sense that it's a totally unjust balancing of the equities, but the Court has said, you know, you have to explain why the refunds won't pass through. We have a ream of evidence in this record with regard to the four refunds that have been made in this case, this very case, for the original delay, for the phase-in, for the refund first ordered, and for the refund first unordered, they all pass through in retail rates, and there was no issue with wholesale customers. There was just that one part, the APSC said it was going to deny one part of that refund, which was known in 2010 when FERC said that doesn't matter. It was known that Arkansas lost wholesale customers in 2010. FERC said that doesn't matter. Practical problems are not the issue. It's whether or not the notice was adequate, the filed rate doctrine, and the supremacy clause apply. So that's two. Three, you've got a utility. It has a tariff that imposes on itself supposedly a disincentive. It knows that. It fights bitterly to keep itself subject to what it now is telling everybody was a disincentive. Because it fought bitterly. You suggest there's an inconsistency there. I'm suggesting. I mean, it seems to me the argument that you should keep the old rate because of the nature of the incentives that it creates is consistent with the view that to retroactively flip that is going to leave decisions made on one economic set of rules inappropriate to a new set of economic rules. And if that's true, and the party, we're talking about the party who imposed the harm wants relief, and that relief would prevent the parties who were harmed from getting any justice. And how they were harmed was because of the fact that the parties were harmed. But, I mean, it's all a complete fallacy. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you.       Thank you. Thank you. Thank you. Thank you. Their argument that virtually all of them have departed, now. Virtually all the wholesale consumers have departed, Your Honor. I didn't see any argument or evidence that that's typical of every case. Well, Your Honor, it is. Well, your representation here doesn't work. The question is, is there anything either in your briefs or in the record that shows that? There is only the fact, Your Honor, that number one, you know, customers change over. That's just a practical fact. It's a known fact. In this case, the fact that so much time has gone by is the product of legal errors. Okay, so but that's a question of that's not going to occur in every case. So maybe that is a reasonable argument for making this case different. We're talking about equity. You've been arguing equity quite strongly. But the only people who are going to pay here are the people who never benefited and are not the cause of the harm. Isn't that right? It's not right. Why not? Well, because some portion of those customers surely were on the system in 1995 and 1996. Without a doubt. I didn't see that argument in the brief either. Well, Your Honor, the argument in the brief is that customers change over all the time. It's normal in every case. Now, just what you're telling me, this is a unique case because it took so long. So many more customers are going to have departed and there are going to be many more new customers now. Okay, Your Honor, we had an evidentiary hearing in 2010-2011. Burke said that's not a fact. There was no new evidentiary hearing after that. So there was no opportunity for us to go in and say this is the number of customers who are still on the system in Arkansas. I mean, we could find that out. There was a petition for rehearing in this case. We found it. And in that petition, did you make the argument and or point to evidence that there are many, some high percentage of customers who benefited who are still on the system? Your Honor, I think they said that in the order on rehearing. Well, I think the order on rehearing, in pointing out the equitable factor, they make this very argument that I'm raising here, I'm asking for your response to. Well, how could I anticipate that? Because they made the same argument in the order, not just in the order on rehearing. I'm not sure, Your Honor. I thought it was just in the order on rehearing. I apologize. Maybe I'm wrong. So let me ask you, going back to your laundry list that I asked for, why isn't this case sort of overhangs that so much time has passed? It may not have been your fault. Maybe the agency made an error, legal error. Maybe the other side was just a very vigorous opponent and dragged the proceedings out. But the fact is a lot of time has passed. Even if I was on the system in 1995, there are a lot of new people who are on the system now. So looking at all these things, FERC says in these cost allocation situations, we just deal with these differently. All right? So notice while it may have been fine had it been two or three years out, four or five years out, it's just not good enough here. And so on down the road. They don't say it quite that way. But isn't that, or is it, what's going on here? Well, Your Honor, I don't think you can say in 1995 until now. In 2008, they made refunds. And then they took the refunds back. So we're talking about the 2008 refunds with regard to how much time has gone by, I think. Because 2008, they made the refunds, no problem with the fact that the customers were there in 1995. Then in 2010 and 2011, they said that is not an issue in the case. Practical problems. My argument is after that, they committed another legal error that this court reversed. And it cannot be a consequence imposed on Louisiana people who were harmed that FERC makes an error and on the basis of its own error and its own delay can deny refunds. Well, the question I'm getting back to is can you harm others who are not at fault? And just to be clear, this is the ultimate paragraph of the order on remand in which they say, refunds in cost allocation cases where over-recovery has not occurred must be implemented through surcharges, which create a zero-sum game in which customers not regulated public utilities are the source of refunds made to other customers. While it may be inequitable that some customers pay too much under the filed rate, the commission also considers the equities involved in assessing additional charges on other customers who are not responsible for the misapplication but who would be required to make additional payments for past purchases. What is it? That doesn't say anything about, you know, the lag in the customer. It doesn't, but this would require a response as to why in this kind of case it's appropriate as an equitable matter to punish people who are not responsible and didn't get the benefit in order to pay back people who should have gotten the benefit in the first place. This seems like an equal weighing of equity here. Well, Your Honor, I think that, to me, that's inconsistent with the Federal Power Act, which says, you know, unduly discriminatory rates are unlawful, and that if you harm somebody with unduly discriminatory rates, you can make a refund. Yes, the Power Act originally, of course, didn't provide for refunds at all. That's right. And then it said may provide refunds. No doubt. And then it said may do so in a holding company situation like yours, only where FERC can determine that the overall holding company will get its money back. And the only way the overall holding company will get its money back here is to charge consumers who are not at fault to pay back consumers who were disadvantaged. That's not, that equitable factor is not inconsistent with the structure of the Power Act. Well, Your Honor, I think if you look at the case of the structure of the Power Act, it deals with localities and the economics of having one set of costs imposed on one locality and another set of costs on another. It has economic consequences that carry through beyond individual customers. And, you know, the whole idea of refunds bumps up against the possibility that some customers have departed and new customers are added. It happens by the thousands or hundreds at least every day. Everybody knew that when they passed the Federal Power Act and the RFA. And certainly... What is the situation where refunds should not be given, in your view? Where refunds should not be given? Yeah. I think there's some merit to the contention in a case of a rate design like a ratchet, which is something that's, you know, designed to affect customer behavior. There's no customer behavior in this case because the retail rates set customer behavior, and they all have incentive tariffs. This is a cost allocation among the sellers. Okay, so if you had a case like Batavia or Norwalk, in which a utility, say, like Energy Louisiana, put in a ratchet to charge an industrial customer or a wholesale customer according to its highest usage in the month. So that industrial customer, in other words, that would then stay the demand charge. Your highest usage will be your demand charge all year. That's a ratchet. Okay, the idea being tamp down the usage on the system. Okay, so then years later, customer sees that and says, okay, we'll use less at that time. Then years later, FERC says, that ratchet, you haven't proven. They never said unjust and unreasonable in either case. You haven't proven that it is a proper promoter of customer incentives or something to that effect. They overruled the ratchet. Well, retroactively, all these customers reacted according to that rate design signal. That's completely different from this case. Is that a decision that was unfair, unjust, and unreasonable? I think you can make an argument that it does. Would that have been brought in the proceeding in which it was determined that the classification was unjust or unreasonable? Well, they didn't say that. I'm asking you. In the circumstance you're talking about, where you think a refund is authorized, would that have occurred, the ratchet circumstance you're talking about, would that have been found invalid because it's unjust and unreasonable? Under what kind of proceeding would it be found invalid? It's for failure of adequate evidence. But isn't that the precondition of a refund? No, it's that you have to prove it's just and reasonable. It basically said you can try again, you just haven't had adequate proof to prove it's just and reasonable. Your Honor, Judge Williams, in that footnote that you mentioned, I think it's the same footnote I'm thinking of, I went through every one of those cases. I think either all of those cases or all but one of those cases are cases where there was no finding that the proposal was unjust and unreasonable. And all those proposals… Proposal, which proposal? The proposal in Batavia, Norwalk for a ratchet and similar type rate design proposal. You mean the rate that was being upset under 206? No, they're all 205 cases. They were before. In other words, you file a 205, it later says you haven't justified it. The issue is can you go back to the date of the filing of the tariff, which went into effect, okay, subject to refund. 206 didn't even come along until 1984. The refunds under 206 came along in 1988 when they passed the Regulatory Fairness Act. Was that the refund that you're talking about in the ratchet hypothetical you're giving me, would that be under 206? No, it was a 205 case. The utility proposed a new ratchet. And when the utility proposed a new ratchet, nobody knew that FERC later on was going to turn it around and say, well, you haven't justified it on this record, which is what they said. And there was, I think, in the court's opinion in those cases, they said FERC has allowed these ratchets, but, you know, FERC found that they didn't provide sufficient support in this case. So let me push you here for a moment. The Chief Judge has been focusing on this final paragraph, paragraph 32, where the agency says we're not unmindful of the court's concern, et cetera, and it goes on. So the question in my mind is, hypothetically, were the court to agree that some of FERC's determinations were arbitrary and capricious, but that the concluding paragraph really comes to the heart of the matter, what would be the purpose of a remand? Your Honor, my understanding is that if, in fact, I was in a case in 1999 where the court ruled, even though it ruled against me, that every ground has to be valid. Ah, that's my point. We have Chenery, so we can't ignore what the agency said, but my point is the problem is just in a hypothetical case. We say the agency made 10 errors, but its 11th point was right on the mark, and that's what it should have said originally, and it just should have closed out its consideration that way. So we grant the petition, and we send it back to the agency, and guess what happens? The agency issues an order pointing to number 11, and it comes back here. I'm just asking the question because that's sort of the implication of some of the questions you've been receiving. They got it right in paragraph 36 in the order on remand, so isn't that enough, ultimately? Well, Your Honor, I think Kirk got a little help from Judge Garland with regard to that point because Judge Garland introduced that these are new customers who never got anything. They never received anything, whereas Kirk said that it can equate the customers who were harmed and the customers who benefited. So Kirk in a separate place said, well, in the past, we've considered this a factor that some customers go away, but I do not believe that Kirk ever put those two things together, and there's absolutely no showing except for these wholesale customers that any customers went away. For that matter, I mean, I'm sure they did, but for that matter, there's not. And yet, still, the fact of the matter is Kirk makes refunds. They made them as a matter of policy. In the 2000s, they made them without discussion in a parallel set of cases that were going on at the exact same time this case was going on. Let me ask you to go back to this point. I asked you about 206B, which says commission may order refunds, and may obviously means there are circumstances where may not. The only example you gave me is the 205 case, the ratchet case, right? Well, you asked me for something that would be justified. Yes, but that's not helpful because 206B is only about proceedings under this section, so that would have to be a 206A proceeding on just and reasonable. So give me an example of a 206 proceeding in which refunds would not be justified. That's your theory. Okay, you have a rate design in place. Your Honor, it's hard for me to believe once notice is given that reliance-based decisions or whatever should be a factor against refunds. I'd say there's two problems with that. One is the word may, which obviously doesn't mean must, and the other is that a notice in the Federal Register or whatever it's worth is not worth anything to a retail customer. You talk about constructive notice. That's all very nice, but the retail customer does not know that they should turn off their heat that day in order to avoid certain costs. So it's fine sufficient notice for purposes of the Act, but not for purposes of equity. What are the answers to those two questions? Well, the answer on the first question is when you were passing the RFA, they asked FERC under what circumstances would you deny a refund, and FERC answered only if the utility was in dire financial condition would we deny a refund. And that's what Congress knew when it passed the RFA and said may, and there are further discussions of that. That would be an astonishing privileging of legislative history. Well, it's true. I mean, it's all loaded up. The fact that one reason is given for granting discretion does not mean that all other reasons are precluded. Well, but they didn't even say that. They said in almost all instances we would grant refunds. That's what we do. That's our practice. Overcharges, we grant refunds. Unjust and unreasonable rates, we grant refunds. That's what we do. They've tried to change that now. With regard to the second point, which I forgot what the second point was. It's from a point of equitable factors, which we asked the commission to weigh, what role does constructive notice to consumers by publication in the Federal Register of the fact that there was a complaint? This is the point that we have, Your Honor. If it's not good enough for a retail customer, well, then it's not good enough when the utility files a rate increase. It's not good enough when any rate change is made at first. You know, there was a case, though. The rate increases are all prospective. The rate increases are put in a file, and then there's a short two-month suspension period. Then they go into effect. The court decides the case five years later. So it's subject to refund. There's a publication of a notice. That is constructive notice to everybody. And that's the way the Act works, just as you said. I understand. The question is, how is it an equitable factor? But those are the refunds going back to the customers. Right. So I don't think they're relevant here at all. Yeah. Wait, I don't understand what I'm saying. It requires the utility to pay back the excess portion that's collected. So the question of notice to customers, unless you say they might object to getting a refund. Oh, you missed my point, Your Honor. It's their ability to charge the rate. The fact that they can raise the rate or change the rate or change the rate design and the rate is based on that public notice. That's what gives them the ability to do that. That's the filed rate doctrine. The filed rate doctrine effectively says, this is the way the rates will be regulated. There's that Louisville Railway case from the 2010 transportation case. Some customer in Nashville is told by the railroad, you can go out west for $60 round trip. So he gets back, they sue him because the tariff on file in D.C. says it's $100. The Supreme Court says, hey, that's the tariff on file in D.C. You have notice. You're charged with that. And that's, I mean, if it's the rule that the Louisiana Commission had to serve process on every return. I'm not saying it's a rule that they had to serve process. We're onto a separate question, not about whether the notice was sufficient to satisfy the act, but the equitable factor that we asked them to weigh of charging some people who are not responsible to pay other people who were hurt. That's the equitable factor. And in that equitable factor, I don't think that the notice, that a complaint was filed which someday may affect other people in other ways, address the people who might not even have been consumers at the time, how that plays in an equitable factor at all. Your Honor, I think we're mixing. Your Honor is mixing. It's departed customers from the notice. The notice is adequate to put everybody on constructive notice. Burke said in the ruling, in the past we have ruled that the departed customer point can be an equitable factor. It did not explicitly rely on that point in this case. And it rejected that point in 2010 and 2011. You don't think the part of the opinion that I read to you indicates that they are relying on that in this case? I thought you were reading something about one set of customers cancels out the other. I don't think it said anything about, well, these are new customers that didn't have a chance to know that this might happen. And where do you think that was raised? I think it's just as a kind of a side point where they said in prior cases that's been a factor. And, you know, they didn't mention that they had rejected that very factor in 2010 and 2011, and those decisions became final. Okay, I have no further questions. Thank you. Good morning. Please support Holly Caper for the commission. I'd like to start with the 2014 opinion from the court in this case and how that altered the commission's approach. I think it's quite clear that the 2014 opinion told the commission that it needed to look at the specific facts of this case and to consider the equities and to, as Chief Judge Garland has pointed out, attempt to balance this difficult case where there does appear to be harm to the consumers on both sides of the equation. That's exactly what the commission did. Turning to some of the points that came up. Harm to both sides of the equation? I thought it was the Louisiana consumers who were hurt. The commission doesn't dispute that as is addressed in paragraph 36 of the remand order. That's one fact that hasn't changed throughout this case. Of course. And the other facts haven't changed either. The fact is that requiring the consumers who had the equation. Right, so the other side of the equation. Who was the other side of the equation? The customers of Energy Arkansas. Now? Mostly the new customers, yes, who would be forced to pay for costs that they did not cause to be incurred. And that is because of the specific fact of this case, again, that we were instructed to consider where it's a highly unusual thing. Energy lost all of its wholesale load, 15% of its total load. Could I just say one of the things that troubled me about this case from the beginning and why I think our opinions were written the way they were to give the agency a lot of leeway here. There are a lot of facts thrown around where there's no record citation. Now, it's not disputed, I gather, that the wholesalers who represented 15% of that particular load are gone. But the argument on the other side is being made, well, if you were only using firm loads, then you made a lot of money. So your rates may have been lower. So maybe the people who are now consumers are paying a much lower rate than other people. And therefore, the type of harm that you're positing, we don't know if it's true or not. And that's why I'm not saying it's not true. All I'm saying is we don't have that information. So when we said these sort of generic factors aren't enough, the theory I thought was that on remand, we were going to get some hard data, some specifics. And we never have. And energy, the intervener, has never represented to the Commission that it cannot provide this information or that it's not available. Yet we still don't have it. So that raises the question, all I'm getting at is, is this a concern that has any basis in reality? And wasn't the Commission at least obligated to consider that? The Commission, I think your question, Your Honor, goes to whether the Commission's equitable considerations are grounded in substantial evidence. We think they were because it is undisputed that energy lost all of its wholesale load during the course of this proceeding. And that really is enough. It's also, I think, undisputed that the rate design, the old rate design, the old cost allocation method did, as a simple matter of fact, put in place an incentive for the energy operating companies not to engage in interruptible sales. Of course, some of them did, mostly Energy Louisiana. And I did want to point out that in the 1999 opinion from this Court in this case, the Court mentions the fact that it was Energy Louisiana that was engaging in approximately 1,000 megawatts a month of interruptible sales. The other operating companies were essentially following the filed rate, following the incentive that is set by the filed rate. I haven't seen anything from the Louisiana Commission where they dispute that the rate actually has that impact. I did hear from counsel for the Louisiana Commission this morning that they think this rate has nothing to do with price signals. But, of course, that's not true. And I'll, again, refer back to the Court's 1999 opinion in this case that discusses the incentives that are set by including interruptible load or not including interruptible load in the allocation of the costs of the system and how that affects the operating company's decision making. I hear, Your Honor, Judge Rogers, that you're looking for additional facts. But, again, we think that is enough to establish substantial evidence here where we have a decision that's based on our equitable discretion. I want to turn to some of the additional points. Counsel says that it would be possible for Energy to produce testimony of people saying that their decisions were, in fact, influenced by this rate design. I saw that Louisiana Commission raised that point. Again, maybe that's possible. I don't know. The Commission didn't think it needed that for substantial evidence to support the exercise of its equitable discretion. It rests on the regular incentives. There is no – well, we rest on the departure of the load, again, and that's important. I'm sorry, on the? On the departure of the wholesale load from the Energy Arkansas system. They lost 15 percent of their total load during the course of this proceeding. And that is what gives rise to the generational concern and the equitable concern that the current customers should not be forced to pay. Oh, I'm sorry. Their charges to fund the refunds to the former customers. I thought we were talking about the question of incentives during the period. I'm talking about both, Your Honor. I'm sorry. I may have mixed them, and I apologize for that. But those are the two. Counsel seems to be saying that energy executives could get up and defend the questions on the basis of their decision-making in that period. I don't know if that's true, Your Honor, but I don't think it's necessary for substantial evidence. Because of the incentives. No? Right. Because of the Econ 101, the operating companies responded to the correct signals that were set on purpose by the rate design here. The concern, in our opinion, was there's always this kind of reliance and always customers coming and going, and the wholesaler's contract expired. Maybe they got a better deal elsewhere or went out of business or whatever. But this was a theory. But did it ever happen? And that's what we were looking for. And I gather that, as you say, I mean, the Commission decided they weren't going to give it. But my only point is the intervener has never said it couldn't produce this information. And, therefore, the negative inference is it didn't because it never produced it, even after the Court made it clear it was looking for specifics. And now we have its filing both before the Commission and this Court. And it's filing. So I'm not sure that I would draw the same negative inference from that. But, again, this Court has held time and time again, in particular in the more recent South Carolina case of farming our order number 1000, that the Commission does not need to have empirical data sets to support economic theory. The fact is that — Yeah, no question. All I'm saying is the Court issued an opinion, all right, that it was looking for specifics. And the Commission is free to say we're not going to give them specifics. Well, the Commission did provide specifics because it described — No, they're not the specifics we're talking about in terms of what Judge Williams and you were discussing. The Commission described the nature of the transactions that the rate design created a disincentive to engage in, the interruptible sale. We understood that that was what the Court wanted in the 2014 opinion. And we do think that's enough for substantial evidence under the Court's other precedent. And it's not inconsistent either with — among other things, I did want to point out, in the rehearing order at paragraph 54, JA 743, it's very clear that Congress also contemplated that this would be a factor. We quote there the Senate report relating to the Regulatory Fairness Act, which describes that Congress expected the Commission to consider, quote, whether and the extent to which a refund would adversely affect decisions made on the basis of energy pricing provisions. That's what we've done here. We've explained the type of decisions that energy would have made if the incentives had been set otherwise. Again, the purpose of rate design is to send price signals. And if the Commission can't rely on price signals as being a factor, then I'm constrained to know what else we would do. And this is in particular because of the Court's opinion in Louisiana 1, the 1999 opinion, that does emphasize those incentives so heavily. I do want to talk about the concept of notice because I think that we can more or less set it aside. The Commission was very clear — You read that paragraph then when it's speaking of energy pricing provisions to refer to the cost allocation as distinct from the rate. I have to ask a clarifying question, Your Honor. Are you in Louisiana 1, the 1999 opinion? I was at JA 743, paragraph 54, that you just cited to us. Okay. I'm sorry. You said JA 743. I just cited it to you, and now I've already lost it. 743 in the middle. I'm so sorry. I'm so sorry. 743. Right. Okay. Paragraph 54. Paragraph 54, right. I mean, I was quoting to you there the Senate report from the Regulatory Fairness Act that contemplated that the Commission would consider whether or not a company can revisit its past decisions in determining whether to grant refunds. So are you reading that? All I'm trying to understand is, are you reading the Senate report to me when it said, affect decisions made on the basis of energy pricing provisions to refer to rates or to costs as a result of cost allocation? Rate design is what I would say. So cost allocation being a type of rate design, right? I'd like to follow up that with a question that I've had. A lot of past talk of cost allocations and rate design. Now, my understanding would be that those are at least heavily overlapping sets but not identical. Is that correct? I think that's correct. I'm not sure, you know, whether it's so relevant to what we have here, but I've always used cost allocation as a type of rate design. So cost allocation being one type of rate design case and one which the Commission is frequently confronted with. So that's why we've called that out in particular. On the matter of the Commission's policy and the cases that the Commission cites in footnote 58, to go back to where we started, I did want to point out that that footnote 58 does include Batavia and Norwalk. And, you know, for the discussion of those cases later on, yes, those were Section 205 cases. But in those cases, the Commission rejected the rate that was proposed under Section 205 and required something else. So it necessarily found that the rate was unjust and unreasonable. Perhaps more to the point, though, that footnote also. Not necessarily. I mean, you're too familiar with these proceedings to reach that conclusion. I'm sorry, Your Honor. I guess I don't know. Go ahead. I mean, in order for the Commission to reject a rate proposal under Section 205, it has to find that it's not just unreasonable. When a utility comes to the Commission under Section 205, it says, here is our rate. Please accept it as just and reasonable. If the Commission rejects it, which is what it did there and what the Court reviewed in Batavia and Norwalk, it necessarily found that the rate is unjust and unreasonable. The words unjust and unreasonable don't have to appear in the Commission's decision. It's a mechanical function of statute. I hear your argument. But more to the point, and perhaps it's more helpful, in that footnote 58, we also cite the Occidental case before the Commission, which we also address in our brief at pages 22 and 34. The site for that case is 110.61378. Paragraph 10 is particularly instructive. That is a Section 206 cost allocation case where a utility came to the Commission with a proposal. We rejected it. We needed to invoke 206 to impose something different, and we made that rate effective prospectively. We relied on the exact same factors that we relied on here, which are the exact same factors that we relied on in Batavia and Norwalk, where the Court affirmed us. Can you address counsel's argument that none of the cases that do not involve a holding company is of any relevance to a case that does involve a holding company? The only time the holding company status of the utilities at issue matters is when we're talking about Section 206C. The Commission has never found that to be a concern. Right, that's very special. And we can talk about that if you'd like. But the Commission has never held, and in particular in the cases that Louisiana Commission raises, that, oh, because this is a holding company, that's why we're going to require these refunds. In the Occidental case, we're also talking about refunds among the customers of an RTO, a Regional Transition Organization, PJM in that case, where we're talking about refunds among the load serving entities. So I don't think that, again, the Commission has never relied on that type of a distinction. If we're going to talk about holding company status, then we should probably talk about Section 206C, which imposes a higher bar for requiring refunds. Let's talk about that. Let's talk about it. Okay. So under Section 206C, it is a higher bar. The Commission has to find that there will not be, quote from the statute, any under-recovery of revenue. The language really couldn't be stronger. Here the Commission found that there is a likelihood that Entergy will under-recover. We simply cannot make the necessary finding under Section 206C in order to provide those refunds. And the basis for the likelihood? The basis for the likelihood is two things. First, the generational shift in the customers. Again, going back to Entergy's loss of wholesale load, we have no reason to believe that Entergy would be able to impose – We just don't know how Entergy would collect those costs, whether from wholesale or retail customers. Second, the Arkansas Commission – It wasn't somehow blocked. What we have here that makes this different from, for instance, the court's 2007 decision, which addressed Section 206C, is the Arkansas Commission has now held that it refuses to pass through these surcharges. The Commission agrees that the supremacy clause – Yeah. We said we think that should require it. I think that there are other factors at play. Why does the supremacy clause require a pass-through? FERC orders a refund. It doesn't order a pass-through, does it? No, that's outside our jurisdiction. So then what is – There's a lot of talk about supremacy clause in these cases. Obviously, if FERC had the authority to order a pass-through, then that's when the supremacy clause would come into play. But here, all you say FERC can do is order a refund, and then it's up to the holding company to try to get the pass-through. Is that right? Yes, that's correct. Well, then what is the supremacy clause argument at all? When you just said you agree that the supremacy clause should – I cut you off. What is the role of the supremacy clause here? Ordinarily, under Nantahala, for instance, the supremacy clause would require the pass-through of rates approved by the commission. The Arkansas Commission has held that that does not apply to Section 206B refunds and surcharges of the type – or the surcharges are the sticking point – surcharges of the type that would be required for Entergy to recover its revenues here, in other words, to collect the refunds to give to the other set of customers. So our position is fundamentally that the supremacy clause issue is certainly interesting, but does not need to be controlling to the court's decision here because the Arkansas Commission has already held, as a matter of fact and law of the case, really, that it won't allow the pass-through. And so that's what makes our situation here different from where we were in 2007. So what about on repairing where – and this is JA 749, paragraph 67 – where you're talking about it doesn't indicate that the retail load in Arkansas needs to be subsidized refunds to be able to pay the Louisiana retail load. The question is, is there any under-recovery by Energy? Right. And I thought on your hearing, the position is saying, well, Arkansas is a side. I'm not sure I read that sentence the same way that you do, Your Honor. What do you think the position is saying? I'm going to read it out loud into the record if that's all right as I get through it. While the examples used by the Louisiana Commission may be used in some cases with respect to retail load, that fact does not indicate that retail load in Arkansas needs to subsidize refunds being paid to Louisiana retail load. I think this is actually the point that's very similar to that in paragraph 36 of the remand order, where the commission is saying it's an equitable consideration, balancing between the Energy Louisiana customers and Energy Arkansas customers. And we can't say that the Louisiana customers' harm is more severe than the harm to Arkansas customers. In particular, the commission is talking about how the departure of load has affected how the surcharges would be assessed to Energy Arkansas customers. And that paragraph also raises the point in the sentence prior that the commission has looked to whether – even setting aside the generational issue that we have here on the specific facts of this case, the commission has looked to whether surcharges can be imposed with precision. It cites the Panhandle Eastern Pipeline case. We also have the more recent Wisconsin case that's now pending before the commission as Verso in 15-1098, where the commission said, you know, we are going to impose refunds and require surcharges to fund them in those cases. And it's because we can do that with precision. Can you explain to me the four refunds that have been ordered and passed through in this case? It's done four times, says the petitioner. That is what the Louisiana Commission says. Is that factually incorrect? I don't have any information to support their assertion. Well, it's in their brief. Right. So you had an opportunity to contest it, and I didn't see any challenge to it in your brief. Am I wrong? What I know is that when Entergy tried to pass through the 2008 refunds that we required in this case, which is the only time we required refunds in this particular case, the Arkansas Commission said no. But remember, the statement is that refunds were passed through on four occasions, and some of those occasions were when Entergy did it without an order from the commission. So I'm thinking that maybe they're referring to when Entergy may have reflected the exchange on the books between the operating companies, but they didn't substantiate their assertion, and so we didn't feel compelled to respond to it. Well, with all due respect, you know more about this case than I do, but their brief is pretty clear. And they say, what's the big deal? We've had four examples of refunds with pass-throughs and no longer covering by Entergy, not a penny. So I would have expected Burt to come back and say why those four examples have no weight here. The only one of those examples that I have any information on from the Louisiana Commission is the 2008 set of refunds, which the Arkansas Commission denied the pass-through on. Well, I know more about those four than you do, and I only know it from reading the brief and preparing for oral arguments. So I don't think that's a fair answer in terms of Louisiana impliedly hiding the ball. And I didn't see any response from the interveners either. But at any rate, that did raise a question in my mind as to what's so different now, because in those cases you have changing customers and all that sort of thing. And then when the case came up to us before, the Petitioner had entered into the record before PERC, and after David's pointing out how these billing adjustments are made all the time, so this notion that you don't have impact on customers, retail customers, is just a fantasy in this world. It happens all the time. The thing that seems to happen all the time is reflecting on the books, in particular in the bandwidth cases, the true-up of the costs as between the operating companies. The real issue here is whether the surcharges can be imposed on the retail customers, in particular, of Entergy Arkansas. And that's what the Arkansas Commission has denied. So that's what's changed, and that's what the big deal really is. But that's why paragraph 67 struck me as just eliminating that concern. That's the paragraph you read out loud. Right. And maybe I'm just wrong in the way I'm reading it, but, I mean, that seems to be what the words say, that ENG is not going to suffer any under-recovery as a result of Arkansas's resistance. Your Honor, I think really the entirety of the rest of the orders make the case that there will be an under-recovery. I'll point you specifically. Well, I'm getting at it. This is on rehearing, all right? So it hurts to take a chance now. It's on rehearing, and it throws this paragraph 67 at me, and I thought, what's happening here? And it's right at the end. Yeah. I mean, it sounds like maybe you're reading that paragraph to assume that the costs would be passed through and there would be no under-recovery, but the commission makes specific findings to the contrary. You know, that doesn't indicate that the retail load in Arkansas needs to subsidize refunds being paid to Louisiana retail loans. Right. And when the commission uses the phrase needs to there, I would offer that what it's talking about is that it's unnecessary because it's inequitable. Again, I read this paragraph as being very similar to paragraph 36 in the remand order where the commission said, we recognize that there's harm to the Entergy Louisiana customers. We recognize that there would be harm to the Entergy Arkansas customers if they needed to pay these surcharges that they did not themselves incur. And so what the commission is saying here is that we think that's unnecessary. In other words, the statute doesn't require it. Excuse me. Just focusing on this sentence, you read needs to subsidize refunds as needs to be forced to subsidize refunds. Yes. To be compelled to pay surcharges. I really do read this as the commission's equity. And, in fact, I think we can all agree that the commission often addresses the equities of particular facts in the final paragraph of each section in its decision and that there it was doing that the same as it did at the very end of the order, paragraph 36. I can wrap up in 36, but I just want to be clear. So I am wrong to read that as saying that energy will suffer no under-recovery if Arkansas refuses to pass through. Yes, Your Honor. That's just a wrong reading, and I should read needs to mean inequitable. Yes, they should not be forced to cover those surcharges, which is just very similar to what the commission said in paragraph 36 of the remand order. Briefly, I wanted to just, on the departure of wholesale load, make it very clear that the commission did address that issue in the remand order at paragraph, I'm sorry, at JA 650, where we discussed that energy had lost 15% of its wholesale load. But the Louisiana Commission seemed to suggest that didn't come up until re-hearing. Obviously, they've now had an opportunity to address it before the court and really have not. I don't think that's been a matter of contest here. That's been the case for a long time. Right. And so, you know, as a follow-on point to that, at JA 749, in the re-hearing order, the commission made it very clear that that was an equitable consideration. So the under-recovery is not just a consideration under Section 206C as to the holding company, but it's also an equitable consideration. If I can just go quickly back to notice, because I don't think I had the opportunity to complete this sentence earlier, the commission also said at JA 652 that notice doesn't override the equities, and that's important. Notice, I think, as Chief Judge Garland has pointed out in particular, is present in every case. It is a statutory requirement under Section 206. If that were the only factor, as the Louisiana Commission suggests it should be, one, that's contrary to this court's opinion in Louisiana 3, the 2014 opinion. Of course, there is no presumption in favor of refunds. And two, that would mean that the commission would never – would not have any equitable discretion, which, of course, is inconsistent with the statute itself. That's all I have at the moment. Any questions? Thank you. We'll hear from the intervener. Please go ahead. Mike May for Intergy Service Company. This paper discussed briefly Section 206C. Intergy believes that this case can be decided solely on the basis of Section 206C. 206C provides a general rule that refunds in registered holding company cost allocation cases are prohibited, with the sole exception that if the commission can find that there's no possibility of loss of revenue, then they may grant refunds. What do you answer to the point that Natahala and Mississippi Power indicate that it can always be passed through, and actually 206C doesn't provide those irrelevant? Well, in this particular case, let's assume that the commission orders refunds and then also orders surcharges to Intergy Arkansas and other companies to pay for those refunds. The commission's order, in effect, would establish that the cost of those surcharges are an appropriate cost of Intergy Arkansas's cost of service. Presumably, the Arkansas Public Service Commission cannot second-guess that decision by the commission because the commission has said, in fact, that it is an appropriate part of the cost of service. That does not necessarily mean, though, that the state of Arkansas, in exercising its jurisdiction over the retail rates, cannot apply cost of service principles and assume that a portion of these costs should be properly attributable to the wholesale customers who have now departed, who, during the refund-effective period, made purchases that caused a portion of those refunds to be required. So I think, notwithstanding the Supremacy Clause and not the HALIA, in this particular case, there will be state issues of cost of service issues, cost causation issues, which the state possibly could consider, which would cause Intergy to not be able to recover all of these costs to the retail customers and would be told, see if you can recover these from wholesale customers.  Pardon me? I would say two things about that. First, that there are all these issues that could be raised that sometimes are not always raised. I think this is one of those issues. With all due respect, I learned about it in preparing for this case. It's in the brief. So I looked to the response of an interviewer's brief for some response. No. What I'm saying is I do think in some of those cases, potentially, people could have raised 206C issues, could have raised the potential for a different cost allocation at the Arkansas level. They did not raise those issues. That doesn't mean they weren't issues that could not have been raised. I think one reason that issue is more prominent today is because of the significant loss of wholesale customers. When did your client lose them? The wholesale customers? Yeah. There was a dramatic loss in wholesale customers. It didn't occur simply because of the long period of time that occurred here. It happened within a very short window of time. Do you know when? I think it was in the late 2000 time period. No, I take that back. I think it was in the early, mid-2000 time period. Largely as a result of the, as I understand it, a result of the commission's order in the FERC order requiring open access. Wholesale customers suddenly had an opportunity to shop around and choose other suppliers. So they lost virtually all their wholesale customers over a relatively short period of time. In some instances, I thought the contracts just ran out and they weren't renewed. Certainly, the contract ran out, but prior to open access, they might have been required to stay there. I understand that. But as the contracts expired, the customers left the system. They had to wait until the contracts expired, but once they did, they left the system. They got a better deal somewhere else. That's correct. That was just a matter of the market.  I understand. Because they had suddenly the opportunity for the first time to go out and shop for alternative suppliers. Excuse me. Do you have a case for the proposition on the Nantahala? Would it be okay for the Arkansas Commission to just say these costs, though part of the cost of service for the Arkansas companies, simply cannot be recovered? I think what the Arkansas Commission would say – and we would argue otherwise, but I think what they would say – is these are costs, operating costs, of the energy Arkansas. And we're going to establish rates for retail customers, and we're going to look at these costs and decide which of these costs are attributable to retail customers and which are costs attributable to wholesale customers. And these particular costs pertain to purchases made in the refund-effective period, roughly 12 years earlier. And there were purchases – at least 15 percent of them, roughly, were costs attributable to purchases by wholesale customers. It's quite possible, I think, that the Arkansas Commission would say, under traditional cost causation principles, retail customers are not responsible for those particular costs. There's nothing in Nantahala that requires otherwise. I'm sorry, sir. You are saying that there's nothing in Nantahala that requires otherwise. That's correct. Can I ask a – Now, had the Commission detailed a particular cost allocation, not only for these surcharges, but for refunds among all of the energy-operating companies, which is something that's simply not done, perhaps you'd have a different issue. So, on just exactly that question, I pulled up Mississippi Power, which references Nantahala's reliance on fundamental principles. Just explain to me why this fundamental principle doesn't eliminate that point. It says, states may not bar regulated utilities from passing through to retail customers PERC-mandated wholesale rates. The cloud rate doctrine ensures sellers of wholesale power governed by PERC can recover the costs incurred by their payment of just and reasonable PERC-set rates. When PERC sets rates, a seller in a wholesaler state may not exercise its undaunted jurisdiction over retail sales to prevent the wholesaler or seller from recovering the costs. Such a trapping of costs is prohibited. Can you distinguish that and explain what the argument of the Commission would be? Here, PERC states cannot say that the costs allocated to a particular company by PERC are not appropriate costs. States then have to apply standard rate-making principles, because they're constantly in the business of deciding which costs are allocated to which customers. They regulate retail rates. They would look at the total cost package of Energy Arkansas and make a determination of which of these costs are properly associated with retail purchases and which of these costs are associated with wholesale purchases. In this particular case, I think they fairly might argue that 85% of the costs are attributed to purchases by the retail company and 15% of the costs are attributed to purchases by wholesale customers. And they would say to Energy Arkansas, we're not telling you you can't recover those 15%. They're just not attributed to us. You need to go and chase those customers and see if you can recover it from them. If you can't, it's not our fault. And who's the our in your sentence? It's not the state regulator's fault. Right. So that means that the utility located in the state might have to absorb the costs? That's correct. And if that's the case, if there's a reasonable possibility of that happening, then you can't satisfy the requirements of 206C, which says the commission cannot order refunds if there's going to be any revenue loss to the home company, any decrease in revenues. And the best case for that is? The best case for that? Yeah, best authority for that is? It's simply the statute itself. Yeah, I haven't seen any case hold quite that. In other words, once the state makes a determination, I'm thinking about this region and what happens here when costs have to be allocated. Well, certainly Energy will argue that these costs should be allocated exclusively to the retail customers or perhaps 99.8% to the retail customers. There's a 2% – approximately 2% – actually, less than 1% wholesale load today. So they would argue that essentially all these costs should be allocated to the retail customer. Arkansas may not accept that. They may choose to allocate these costs based on cost causation principles. No, I understand your argument about that. The question is what happens to the utilities located in Arkansas who are subject to the Arkansas Public Service Commission? Your theory is that bleeds back. My theory is that Energy Arkansas would lose revenues. They would recover the 85% that the state has attributed to retail load. They may not be able to recover the 15% that's been attributed to the wholesale customers because those customers no longer have contracts with Energy Arkansas. In the real world, just so I'm clear, you know it a lot better than I do. In the real world, these retailers are hooked up with other people, other companies that consider contractual arrangements. So it's not as though they've disappeared off the scene or that they can't be found. All I'm getting at, you may be entirely right, but aren't we off in the realm of speculation here in terms of there's something in the record about this, and FERC didn't deal with it that way. It just said, look, equity. Well, what FERC said was that they are uncertain as to the utilities' ability to recover this 15% of the cost. The world is uncertain. I mean, you know, that's all I'm getting at. Congress knew that. Well, Congress said specifically under 206C that you cannot make refunds, FERC cannot order refunds if there's going to be a loss of revenue. They said that refunds are prohibited, and then it said, except if you can make a finding, there will be no loss of revenue. And here, there's a potential loss of revenue, and it's not irrational. Is there a question from the bench? Okay. Thank you very much. Okay. Is there any time left for the petitioner? I will give you another two minutes. Thank you, Your Honor. I have a couple of questions, which I may or may not be able to sum up. First, in the four refunds, was any of them challenged? Did any of them lead to a- One of them, Your Honor, is the one that they're relying on. If you look at things- One that came out the other way, you mean? No. On pages 350 to 353 of the joint appendix, we provide energy's data response in a retail case, showing how all the refunds and surcharges were collected in retail rates, in this case, for the four refunds. The fourth page is the one for 2008. It's on page 353. It shows, and this is true of these allocations, the interruptible load affected about eight or nine allocators in the system agreement. Four of those, which produced a charge of about $2 million, a credit of about $2 million, and some other changes for Arkansas, flowed right through in Arkansas retail rates through the fuel clause. There's one category that energy has to go to a base rate case, which don't happen every year, to collect, and it may not even fall into a test year. Energy waited around two years, and then while this case was pending, at this point playing with play money, they go to the Arkansas Commission and they say, give us that. The Arkansas Commission order is in the appendix. The Arkansas Commission order, that whole thing was rejected by FERC in 2010 and 2011, but it's in the appendix. It doesn't say anything about wholesale customers leaving. It doesn't say anything about retail customers, you know, might have changed over. It says we have a retroactive rate-making rule here in Arkansas, and so we're not going to grant these refunds, which the court in LPSC-2 said is not an argument. And so all four have passed through. The fourth one passed through in part, and it was held up, and then FERC changed its opinion so the case became moot. Energy had already gone to the federal court on trapped cost and said they have to give it to us under the supremacy clause. But that was only dealing with the ‑‑ What is your answer to my question whether any of these famous four were contested? Oh, yes, Your Honor. Well, on these ‑‑ Because when I turned to the pages you cited, I get a big list of names. I know, I know. I'm trying to think if ‑‑ I don't get that. Well, the fourth one was contested. That's the one, well, Arkansas contested it, which basically allowing that gives a veto, a subdelegation to Arkansas to decide the Federal Power Act, and it never got resolved in court. FERC took back the refund order. So to sum it up, of the four, three were not contested. One was contested but does not end up in a ruling. Right. That leads to my side point, which is at this very same time, and we have provided you with citations to the orders in Arkansas, there were other virtually identical cases, and we filed for like our 2007 complaint on interruptible load for the bandwidth. We filed exactly how much wholesale load was on the system then and how much is on the system after that, and there were something like 2007, nearly 2 million megawatt hours of sales to wholesale customers, and FERC ordered a refund without even any discussion. It went right through in Arkansas. We cited you the order. This is a situation where FERC is not being consistent. FERC has routinely granted these refunds and surcharges irrespective of the wholesale customers, and to your point, Your Honor, that you had me on the ropes with in paragraph 36. I didn't feel like you were on the ropes. Well, Your Honor, the commission said in that paragraph 36, we're not going to force the ones who made payments for past purchases. They're talking about the consumers who are still there. They're not talking about new consumers in paragraph 36. At the very bottom of that page where paragraph 36 is, you can see we don't want to have them make additional payments for past purchases they reasonably concluded were final. So what they're saying is literally the consumers who benefited are just as important as the consumers who were harmed. What about paragraph 67 of the order? I don't know if I was— This is the one I think you referred to as merely describing a past case. Indeed, the commission has previously found that a requirement that current loan would have to pay for charges incurred by past customers or prior generation of customers is an equitable consideration that supports denial of refund. Right. And they listed those same things in the orders that were reversed in LPSC 3, but they didn't explicitly rely on that. Well, here they appear to be relying on it. It's in a paragraph. The indeed in front of it is not just we're giving you a random citation of past cases. It's paragraph 67 on page 749. Your Honor, I'm not sure. Maybe you're right, but, you know, what they're responding to is our claim that this wholesale customer argument is completely bogus, and that was the point they're addressing, and they're saying, well, you may be right, and then they switch over to this thing. And, you know, they— I don't even know how that relates to the point they're addressing there, but I can tell you this, they previously rejected that very argument in 2010 and 2011, and my understanding is that the FERC has to explain changes on that, which that's not an explanation at all. I mean, but the point is, I mean, we've got evidence. We put in evidence. They go through. Also, Your Honor, if you want to take a look at it, the wholesale customer argument came up in Arkansas with regard to the bandwidth refunds, and the Arkansas Commission said that's not a factor. These refunds for the 2005 delay of making the refunds in 2011 and 2014 were bound by the Supremacy Clause. Are there further questions? Yeah, I do have a question. Where is it in your brief or in your petition pre-hearing that you say that the cases accumulated by the Commission in footnote 58 are irrelevant because they don't involve a holding company? There seems to be a major thesis of yours in response to my question about those cases. Yes, Your Honor. I just want page numbers. I don't want a page explanation. All I ask is page numbers. Your Honor, I can't give you a page number. I can tell you this. We explained at first that those are rate design cases. Those are not holding company cases. That whole issue was— This is a rate design case. What? This is a rate design case. No, sir, not in the sense of what those rate design cases were. This is a cost allocation among affiliated sellers of electricity. I'm sure you're saying that cost allocation cases are not a subset of rate design cases. Yes, sir. In this case, that's true. If you're cost allocating among classes of customers, these retail rate payers versus these wholesale requirements customers, yes, it would be, but that's not what you're doing. All you're doing is saying energy companies, the system makes the sale. Energy companies, these are your costs. You pass them through at retail through completely different tariffs. So what is happening is that interruptible load went into the allocator that spread the cost among the companies. That is completely different from when you're dealing with— Where did you say that in the petition for rehearing? I don't think the petition for rehearing said that, Your Honor. We went through all this in LCSC. It's kind of central. The commission relies on a set of cases in its remand order, and I would think that if you object to its characterization of those cases or their relevance, it would behoove you to say something in the petition for rehearing. Okay, this is what we said, and we did say something. I'll send you a letter or something. We said those are the cases you relied on that the D.C. Circuit told you do not establish a policy. They were cases involving other issues such as this rate design or the— That's not my recollection. Well, Your Honor, that's what we said. I mean, they're all completely different. There's no holding company case that they cited except some of them. We're back to holding company. Okay. No further questions? Thank you. We'll take the case under submission. We'll have a brief break while we change a lot of chairs here.
judges: Garland, Rogers, Williams